IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| MERRY WARNER | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:10-CV-023 |
| | ) | |
| PIONEER AUTO SALES | ) | |
| AND LEASING, INC. | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND DESIGNATED EVIDENCE AND STATEMENT OF MATERIAL FACTS**

INTRODUCTION

Pioneer Auto Sales and Leasing, Inc. is in the business of leasing cars and selling

cars under a "Buy Here Pay Here" system. The main store is in Plymouth, Indiana

but it also has satellite stores in Valparaiso, Warsaw and Osceola. Brent A. Schafer is

the Vice-President and in charge of all of the offices.

Merry Warner was hired on August 25, 2007 to be secretary/office manager at the

Osceola store. The Osceola store is a small operation and had three (3) employees as

follows:

      A. Sonny Balser – Salesman;

      B. Tom Sisk – Utility man;

      C. Merry Warner – Secretary/Office Manager.

Plaintiff remained in that position from the time she was hired to the time she was

terminated. There is no other position for her to be advanced into. True, she received

a raise after her ninety (90) day probationary period, but that was automatic.

Plaintiff was terminated October 17, 2008 because of an inability to adapt to the upgrade in the software which was changed in June, 2008.  Defendant changed the software and went to a web based system where the data was stored off-line and the Plaintiff could not master the tasks.  The other offices had no trouble.  (Schafer aff. ¶ 4-9)

PLAINTIFF'S COMPLAINT

Plaintiff's complaint was filed December 23, 2008.  In it she states during the time she was employed she was "Sexually harassed by Chris Sarna, assistant manager.  I complained to Brent Schaeffer (sic), manager, but the harassment did not stop.  After I complained I suffered retaliation by termination of my employment on October 17, 2008".  (EEOC Complaint Ex.9, p.1)  In a follow up letter dated October 7, 2009, over nine (9) months later, her counsel wrote a letter to the EEOC, and stated:

> However, the company does not address the most serious charges of sexual harassment and retaliation.  Attached please find e-mails sent to Merry Warner by Chris Sarna, assistant manager.  These degrading, humiliating and sexually explicit e-mails constitute sexual harassment. This is especially true since Chris Sarna several times a month asked Merry Warner out, even though Chris Sarna was married and he knew Merry Warner was in a committed relationship.  Chris Sarna would say things to Merry Warner such as "I want you to be my girlfriend", Chris Sarna implied to Merry Warner that if she had an affair with him her job would be guaranteed at Pioneer and she would receive a promotion.  Merry Warner believes that Chris Sarna had an affair with another woman who was an employee and that employee was given a double promotion.  These e-mails and statement of Chris Sarna constitute a serious case of sexual harassment and quid pro quo sexual harassment".  (EEOC materials, Ex. 9, p. 2)

Counsel in the above states "the company does not address the most serious charges of sexual harassment". However, given the fact that this is the first time they appear, nine (9) months after the filing, Defendant would not have been able to respond. It is more likely, that her story gets better as she embellishes it. It is hard to believe that if Mr. LaSalvia had the e-mails and the other assertions contained in his letter of October 7, 2009, that the Plaintiff would not have used them in her complaint filed December 23, 2008.

Since the bulk of Plaintiff's charges rest on these e-mails, a close examination of them is necessary.

Collectively, the e-mails contain the following characteristics:

1. All were originally sent in March, 2007, five (5) months before Plaintiff was employed by Defendant. (The affidavit of Rhonda Saltzman, Plaintiff's predecessor, ¶3, will be used to identify the e-mails. These are identical to the ones sent by Mr. LaSalvia to the EEOC.)

2. Secondly, all of the e-mails were initially sent from the Pioneer Osceola office prior to the employment of Plaintiff.

3. Thirdly, all of the e-mails were forwarded on June 19, 2008 from the Pioneer Osceola office to Merry K. Warner to her home.

4. Fourthly, all four (4) e-mails were sent within a four (4) minute period: Exhibit "1" was sent at 12:42 p.m. and Exhibit "4" was sent at 12:46 p.m.

5. Finally, there is only one computer in the office at Osceola and it is at the desk of Plaintiff.

The employee who occupied the Plaintiff's position at Pioneer Osceola before the Plaintiff was Rhonda Saltzman. Rhonda Saltzman has filed an affidavit stating that she worked at the Pioneer office in Osceola from March 10, 2005 to August 6, 2007. She indicates she sent all four (4) e-mails. Starting with Exhibit "1", a five (5) page e-mail, she indicates was sent by her on March 27, 2007 at 3:35 p.m. Its title is "Barbie's from MI". It had relevance to her because she was from Michigan and her family is from Michigan. She indicates the persons to whom she sent it are reflected on the e-mail and they all have particular relevance in her life either as family members or co-workers. (Saltzman aff. ¶ 2 and 3) She further indicates that the pictures never had any sexual connotation with her, it was "merely a spoof on different towns in Michigan and the culture there". (Id. ¶3)

At her deposition, the Plaintiff was asked about this e-mail and despite the fact that its origin was the computer at her desk at Pioneer Osceola, she stated that Chris Sarna, who works in Plymouth, e-mailed it to her. (Warner Dep., Ex. 10, p. 12). However, she later acknowledges that the e-mails were on her computer and discovered by her in August or September 2008 (Dep., Ex. 10, p. 160). When questioned as to why she didn't just delete them her response was "I don't know" (Dep., Ex. 10, p. 31, l. 16). She was then asked concerning all the persons to whom it was sent, and she stated that they were related to Sonny (Balser) and the owners (an assertion which Sonny Balser and the owners deny). (Balser aff. ¶ 13). When queried concerning the "mom and dad" cc she stated they were Sherman and his wife (the owners) (Id. p. 15), an assertion which Lee Prater denies (Prater aff. ¶ 4) and Brent Schafer denies (Schafer aff. ¶ 15). When queried about Patsy, Sam, Sandy and

4

Wendy, and other addressees of Rhonda Saltzman, she indicated she met them at a party the Prater's had in July of 2008 (Id. p. 14), an assertion which Lee Prater denies (Prater aff. ¶ 3).

Continuing, concerning the June 19th 12:42 time she acknowledges that the merryk1956@sbcglobal.net is her home computer address. When pointed out that she must have sent it to herself, (Id. p.16) she testified that Chris Sarna was there that day as follows:

> Q. Okay. So how long was he there that day?
>
> A. The full day, from 8 to 5:30. (Id. p. 17, l. 23-24)

The affidavit of Brent Schafer, paragraph 12, and Chris Sarna paragraph 4, establish that he was in the Plymouth office at that time. Moreover, Plaintiff's testimony is further destroyed by the affidavit and documents attached to the affidavit of Brent Schafer indicating that Chris Sarna was not at the Osceola store on June 19th (Schafer aff. ¶ 10, 12 and 14) with documentation as follows:

> 12. The following receipts were signed by Chris Sarna on June 19th, 2008, showing his location on June 19th as being in Plymouth, not Osceola.
>
> > Receipt No. 14584 at P. 1
> >
> > Receipt No. 14586 at P. 2

Receipt No. 14584 shows him signing a receipt indicating a $100.00 payment by Tondy Hinton on June 19th and Receipt No. 14586 shows a receipt on June 19th of $82.00 by someone named Rohlder for a van payment.

Also, she testified that the reason Chris was at the office at June 19th was because Sonny Balser was not there (Dep. Ex. 10, ¶ 17 & 20).  However, Sonny Balser in his affidavit paragraph 12, states that he was at the Osceola office on June 19th.

She states that she did not send the e-mail to her house although acknowledges it was there when she got home.  Her explanation is that she thinks Chris sent it to her from the Osceola office.  She thought the e-mail was disgusting and should not be shown to anyone (Dep. Ex. 10, p. 20) and in particular, her jeans on page 2 should not be shown to anyone (Id. p. 19)

The Plaintiff was then questioned on Exhibit "2".  It was pointed out that it is titled "Best Piercing Ever", and was originally sent March 21, 2007 at 4:04 p.m. (Ex. 2 – Saltzman aff.).  She says she first saw this "definitely before June 19th", probably even in September.  (Id. p. 26, l. 23-24 and p. 28, l.1)

When questioned concerning Exhibit "2" and the fact that the e-mail was from Wendy Lien and states "IS this you?", Plaintiff indicated that she thought it was one of Chris' "groupies" from his band.  (Id. p. 27, l. 14-15).

When questioned on how Exhibit "2" got to her home on June 19th, she stated that she thought it was faxed to her by Chris. (Id. p. 29-30).  When asked where the fax number was, showing the origin, her response was that she didn't know, she had so much paperwork. (Dep. Ex. 10, p. 30)  She further testified that Chris forwarded them from the Osceola store – even though he wasn't there – to her house.  None of this makes sense, but it was her testimony.  Although she does admit she is on Zanax (Ex. 10, p. 31, l. 22) and even Methadone (Dep. Ex. 10, p. 153), which might shed some light on her account.

She was then queried on Exhibit "3" entitled "The Taste of a Kiss". She says she got this from Chris in 2008 even though she acknowledged it was on the computer at the time of her hire. Explaining how they got from her computer to her e-mail address at home her explanation was:

> Q. So on the 19th when Chris – you say Chris is there, and brings these up
>
> A. (nodding)
>
> Q. Does he say; I'm going to send all those to your home phone - - or, your home computer?
>
> A. No. He wouldn't tell me, he would just send them, and - - you know, and he didn't really want to get known by it.
> (Id. 35-36)

She was then questioned on Exhibit 4 which is entitled "Alabama Death Penalty". Exhibit 4 is particularly interesting because not only was it sent within four (4) minutes after the first one, but it was sent to jano@aol.com which the Plaintiff acknowledged is her sister (Id. p. 40, l.5). She stated that she did send it to her sister, and when asked why, she stated, "I was talking with her about what I am going through on this job" (Id. p. 40, l.9). Although she acknowledged that she sent it on June 19th at 12:46 from Pioneer Osceola and within two (2) minutes of the last one, and four (4) minutes from the first one, (Id. p. 41) when questioned on how Chris could be sending the others, two (2) and four (4) minutes previous, her testimony was as follows:

> Q. And you sent this one at 12:46. So you are saying Chris is sending these to your house, and within two minutes you are jumping on in front of Chris sending one to your sister?
>
> A. Uh, I don't - - I don't know, maybe I did.
>
> Q. Did what?

A. When I finally got him away from my desk. Because that's when he wanted to do is pull up e-mail, and harassing me.

Q. Well you are the one that sent it to your sister.

A. Well, I can't - - because I wanted advice, and I was really upset.

Q. Did you - -

A. I was upset for several days the whole time that I worked there.

Q. You sent it to your sister while Chris was right there. Is that what you are saying?

A. No, Chris was not right there.

Q. Where was - -

A. I finally got him out of my office.

Q. Okay. And two minutes later after he sent, you sent one to
   your sister?

A. Yes, ya. And I was trying to say I can't, I'll speak with you Jan. I'll call you tonight. But here's just a small example of an e-mail that I am getting just about daily.

Q. You don't say that.

A. No, I'm not going to say that that I'm going to call her. I have spoken to her several times over there.

Q. So you are talking to her within two minutes of him sending the last e-mail to your house?

A. No, no. I called her that evening.

Q. Okay. So you called her that evening to tell her about the e-mail that you sent two minutes after he sent the last?

A. Right. (<u>Id</u>. p. 42, l. 2 to p. 43, l.8)

Obviously, the Plaintiff is trying to dodge the implication of her having sent these to herself.

More significant is the affidavit of Rhonda Saltzman and Plaintiff's attempt to identify all of the addressees in the subject "Barbies From MI". The Plaintiff fabricates relationships to somehow tie the e-mail to the Defendant. She says they were "groupies in his band". She says that the reference to "mom and dad" are the owners of the business, yet Brent Schafer, the vice-president who has been employed for 20 years with the business states that Sherman and Lee Prater have never been referred to as mom and dad by any employees (Brent Schafer aff. ¶15). Lee Prater also states that none of the employees have ever referred to her or her late husband Sherman as mom and dad, and the persons copied with the e-mail, Debi, Dee, Wendy, Denise, Deanne, Ellen, Jan, Melanie, Patsy, Sam and Sandy, were not at any party at her house as testified to by the Plaintiff. (Prater aff. ¶ 4)

Besides all of the above, Plaintiff's explanation is tortuous. Once she acknowledged sending the one e-mail to her sister at 12:46, it has to follow that she herself sent the offending e-mails to herself as well. Instead, she concocts a story that makes absolutely no sense in order to conceal the fact that she herself sent the e-mail messages to herself at her home e-mail address and is blaming Chris Sarna and therefore the Defendant. The addressees were friends and family of Saltzman, and Plaintiff has to fabricate relationships to make it fit her lawsuit.

Further refuting Plaintiff's story are the instant messaging transcripts between the stores. These are copies from the Osceola computer and are attached to Brent Schafer's affidavit as follows:

Exhibit 5 – Transcript between Osceola and Valparaiso
Exhibit 6 – Transcript between Osceola and Brent Schafer
Exhibit 7 – Transcript between Osceola and Warsaw
Exhibit 8 – Transcript between Osceola and Chris Sarna
(Schafer aff. ¶ 2 and 3)

There is only one computer at the Osceola store, which was located at the Plaintiffs desk, although Sonny Balser, the salesman, had access to the computer from time-to-time. (Sonny Balser aff. ¶ 3) He indicates there were times when he noticed on the computer screen messages she was sending to Chris. He states he read some of them and found them to be of a suggestive nature, and acknowledges there were times when he would play off of what she had written and make comments of his own as though he were her. He has lined through those transmissions of his on Exhibit "8" (Balser aff. ¶ 3 – 5). He also states he told her this would eventually cause trouble and asked her on several occasions why she was flirting with Chris, "and she would just laugh it off". He thinks this happened as many as ten times. (Id. ¶ 6 and 10) He also authenticates some of the messages in the transcript of similar discussions with him concerning the fact that she wanted to go hear Chris play in his band. (Id. ¶ 11 and Ex. "8") Chris Sarna also authenticates the instant messaging log between himself and the Osceola store. (Chris Sarna aff. ¶ 6)

To begin, there are numerous passages from Plaintiff on how great everyone is at Pioneer:

       (a)        Page 8-1, 11/20/07 at 9:42

       (b)        Page 8-13 on 5/27/08 at 2:05 and 5/28/08 at 9:34

       (c)        Page 8-25 – 8/21/08 at 3:41 (Schafer aff. Ex"8")

Her appreciation of Chris is set out as follows: (Given in abbreviated form)

P. 8-1 – 11/20/07 at 9:42 – making brownies to bring to him.

P. 8-2 – 11/20/07 at 10:04 – your a good guy … awesome Chris.

P. 8-4 – 4/8/08 at 10:32 – Your so nice Chris

P. 8-5 – 4/15/08 at 4:09 – You Rock Chris

P. 8-10 – 5/6/08 at 3:23 – I enjoy talking to you.

P. 8-26 – 8/27/08 at 12:21 - … such nice co-workers

P. 8-33 – 9/23/08 at 4:47 – you Rock!
            9/27/08 at 11:17 – you nice to talk with

P. 8-34 – 9/30/08 at 4:32  (<u>Id</u>.) – Your such a good guy!

Plaintiff was also interested in going to hear Chris play in his band as indicated in paragraph 11 of Sonny Balzer's affidavit.  This is authenticated in Exhibit "8", <u>supra</u>., at the following locations:

P. 8-6 – 4/18/08 at 12:53
            4/18/08 at 2:33
            4/18/08 at 2:43

P. 8-7 – 4/18/08 at 4:27

P. 8-13 – 6/12/08 at 4:04

P. 8-15 – 6/27/08 at 8:50

P. 8-27 – 8/28/08 at 1:44 (<u>Id</u>.)

The more salacious messages are shown at the following pages.  Restraint has been used because there is so much material:

P. 8-3 – 3/10/08 at 1:25 – Hi There Big Guy How's your love life treating you or teasing you! If that's that to personal forget I said that - - Big Guy

P. 8-3 – 4/03/08 at 4:48 – Hey Chris -- I had no idea that your first wife left without her child! I could not live without my kids but I quess it takes all kinds -- Your the Kind hearted Great DAD! Wonderful -- Mr. Mom fits you!

P. 8-4 – 4/04/08 at 11:15 – YOU MEAN ROUGH SEX! I THOUGHT GUYS LIKE IT ROUGH!

P. 8-4 – 4/04/08 at 11:19 – A MOON IS WHEN A PERSON PULLS THEIR PANTS DOWN AND SHOWS THEIR BEHIND! MY SISTER-IN LAW DID THIS ON 1-94 TO A TRUCKER! WE WERE GOING TO FLORIDA AT THE TIME -- WE HAD SO MUCH FUN -- ALMOST LIKE THELMA AND LOUISE HA HA

P. 8-7 – 04/21/08 at 1:37 – CHRIS I HAVE NOT DATED IN YEARS --

P. 8-7 & 8-8 - 04/23/08 at 2:12 – Hey chris I need my own business cards -- I can sell to! -- Plus I have other talents……………………………………..

P. 8-12 – 05/19/08 at 3:17 – HI -- What does Marybeth mean by "Who's the best" -- This is on her e-mail logo – Answer wisely? I'm LOL because I have a dirty mind! -- Merry

P. 8-14 – 06/19/08 at 2:28 – I hear you have been working with it for a while – so you guys have sharpen your skills already ---- Ya it seems like it won't B toooooo hard on – Oppsss I mean difficult – ha ha merry --

P. 8-24 – 08/15/08 at 2:23 – anything for a nice guy like yourself!

P. 8-24 – 08/18/08 at 3:32 – YES IT'S in
        3:32 – sock it to me baby --------- babbbbbbbbyyyy
        3:33 (Chris to Osceola) – OK/
        3:34 – SILLLLLLLLLLLYYYYY MEEEEEE – IT
                SOUNDED FUNNY ITS IN!!!

P. 8-25 – 8/19/08 at 2:48 – OHHHHHHHHH tied up by his wife!! Bondage! Wow i thought he was into somethingggggggg – ha ha –

P. 8-25 – 8/20/08 at 3:11 – Almost anything for You Band player!!! :p Mare

P. 8-27 – 8/28/08 at 1:46 – DARNnnnnnnn!!! – I bet your happy though you have time for lots of SEX!! Ha ha

P.8-27 – 8/28/08 at 1:47 – Ready forrr--It's been so longgggggggg------Plus I'm just not interested in Jim no moe ----he doesn't turn me on –

P. 8-27 – 8/28/08 at 1:50 – When I think of the old days I just "SMILE"" A LOT!!--

P. 8-27 – 8/28/08 at 1:51 – DID YOU EVER HAVE A 3 SOME?? WOW LISTEN 2 ME getting real personal -- It was FANTASTIC!--

P. 8-27 – 8/28/08 at 1:52 – I better stop we have to work – can;'t have a hard on!

P. 8-30 and 8-31 – 9/11/08 at 10:01 – Sonny thinks i'm flurting with you! But it's in a nice way right -- I'm not leading you on am I -- I'm not trying to -- I just feel confortable laughing & joking with ya—Merry (Id.)

Plaintiff, for the most part, disavows that she is the author of the messages, although she does admit a few. She does acknowledge communication with the Warsaw office (Schafer aff. Ex. 7) stating on 4-3-08 at 1:26 "The people I work with they are super", acknowledged at Dep. p. 55, l. 12.

She acknowledges referring to Chris as "Big Guy" (Dep. Ex. 10, p. 64 and Ex. 8 p. 8-3 on 3-1-08).

She acknowledges "Hey I brought brownies in for the Osceola boys today! -- I'll make some for you tomorrow -- make sure someone can bring them to you -- or of course I can deliver them -- Merry". (Ex. 8 p. 8-1, 11-20-07 acknowledged at Dep. Ex. 10, p. 67)

On Dep. p. 74/75 (Ex. 10) she acknowledges sending the message on 8-4 at 10:31 which says "GOOD MORNING CHRIS - - HOW IS THE NEW GIRL IN WARSAW

WORKING OUT - - DO YOU KNOW? IS SHE PRETTY? - - I'M JUST CURIOUS.

MERRY". This message was sent at 10:31:29 a.m. However, she denies the message

sent 55 seconds later that says "YOUR SO NICE CHRIS". (Ex. 8 p. 8-4, denied at Dep.

p. 75) Her explanation is that within this 55 second period, Sonny did it:

> Q. Are you saying that's what happened here in less than a
> minute?
>
> A. Yes. (Dep. Ex. 10, p. 75, l. 18-20)

At dep. page 79 she acknowledges the message of 4:21 that states page 8-7

"CHRIS I HAVE NOT DATED IN YEARS". However, in the message 6 minutes later

she informs him of her roommate and the fact that they "have no relations together

anymore," she denies.

At page 104 of her deposition she acknowledges the transmission at 9:49

concerning a client, Tatinesha Jenkins (Ex. 10, p. 8-21). However 10 minutes later at

9:54 she refuses to acknowledge the transmission "T.Y. [thank you] christopher! Your a

good man!".

At page 123 of her deposition she acknowledges the message in Ex. 8-33,

transmitted at 11:17 which says "thanks so much Christopher -- I know you nice to talk

with -- you make me laugh". Then, at 11:18, 1 minute after the acknowledged message

she states "R u playing this tonight somewhere" – 8-33. When confronted with the 1

minute interval she testified:

> Q. Well, that's less than a minute later too, isn't it, is it the
> probability that you did send it?
>
> A. Well, no. Because a minute -- anything can change in a
> minute.
>
> Q. So you think in a minute, or under a minute, Sonny got

in there and responded?

A. Could be.  (Dep. Ex. 10, p. 124, l. 11-17)

She needs to disassociate herself from the many inquiries concerning Chris playing in his band because they show her pursuit of him.

At page 125 of her deposition, she acknowledged sending the message shown September 30th at 4:31 (Ex. 10, p. 8-34), but at 4:32, a minute later, is a transmission "Your such a good guy!  Thanks for looking out for me! – merry" (8-34), she denies. When confronted with this she stated "I would never tell him he was a good guy" (Dep. Ex. 10, p. 125, l. 14)  Here again, her explanation was that Sonny Balser must have come in during the one minute interval and sent it.  (Id. p. 126)

Plaintiff also attempts to trash Chris Sarna by stating, throughout her deposition, that he had done stuff like this before and had even been written up and disciplined for it. One of the "affairs" that she alleges he had was with Mary Beth, one of the women in the Valparaiso office.  She says that Sonny Balser told her that Chris had gone out with Mary Beth and that Chris had been written up or almost fired.  Sonny Balser denies said allegations at paragraphs 15 and 17 of his affidavit.  Chris Sarna denies ever saying anything inappropriate or that he had never been disciplined and had no relationship with Mary Beth at the Valparaiso store except as friends (Sarna aff. ¶ 11).  Further, Brent Schafer states that Chris Sarna has never been written up for any similar conduct and that he had no knowledge that there has ever been any inappropriate conduct between Chris Sarna and any of the employees (Schafer aff. ¶ 16).

Finally, Mary Beth weighs in and states that she has never gone out with Chris Sarna but that they have a close relationship.  Mary Beth elaborates by identifying the

transcript, Exhibit "5", in the Brent Schafer affidavit, and finds that it is an accurate record of the instant messages between Valparaiso and Osceola. (Mary Beth aff. ¶ 3) In the messages on the day she was terminated, October 17, 2008, Plaintiff tries to stir up antagonisms in the following exchange:

> 10/17/08 – 9:02 – Osceola to Mary Beth – Hey Marybeth it's been nice know you - - but I must tell you what the word is about you - - around here to much gossip
> …
> It's not very nice but I will tell you what everyone has said about you - - Thanks for everything I think your alright!
> …
> I will call you sometime today - - You will be shocked! - - Merry
> …
> I know you will not like what it will be! But I have always wanted to tell you what these guys are saying about you! I never believed it either
> …
> You and chris went out correct - - (Schafer aff. Ex. 5 p. 5-8)

Mary Beth's response to this trouble making was " **no……never! We just have a very close relationship is all** (emphasis added) (Id.)

The Plaintiff acknowledges sending the e-mail to Mary Beth (Plaintiff Dep. Ex. 10, p. 51). Upon being questioned as to why she was telling Mary Beth this on her last day she stated she didn't know (Id. p. 52), and she has no idea why she did so the last day (Id. p. 53).

The above again shows that the Plaintiff is not telling the truth in her deposition she responded to questions concerning Mary Beth's relationship with Chris as follows:

> Q. How do you know?
>
> A. He [Tom Sisk] told me.
>
> Q. How does Chris -- how does he know?

> A. Mary Beth -- it's all in the whole office. Renee knows, the one that was fired. Renee told me. **Mary Beth told me herself**. (Dep. Ex. 10, p. 138, l. 9-14) (emphasis added)

If Mary Beth had told her, why would she be asking Mary Beth in her final message exchange? Also, Tom Sisk who Plaintiff testified is a "really nice guy" who is "kind and understanding", (Dep. Ex. 10, p. 138 l. 3-4) states that he never told her that Chris had any involvement with anybody nor did he ever tell her that Chris has been written up or almost fired for any misconduct related to any woman. He further states that he is not aware of any conduct by Chris Sarna as alleged (Sisk aff. ¶ 4 and 5). Additionally, he states that she never told him that Chris was making any advances on her or any improper conduct or talk from Chris. (Id. ¶ 7)

## WORK PERFORMANCE

In June of 2008, Pioneer changed the software it used to input financial date. The software was now a web-based system where the data was stored off-site. It was customary software for sellers of used cars. The Plaintiff could never master the software although the other offices had no trouble. The Plaintiff was frequently inputting data incorrectly and losing track of deposits. (Schafer aff. ¶9)

Mike Endres was the internet technology employee for Pioneer, and he states that in June 2008 the company went to software known as Finance Express, a Dealer Management Software (DMS) which was customarily used by car dealers. (Endres aff. ¶ 3) Further, he estimates that on approximately thirty (30) occasions he went to the Osceola store to help the Plaintiff use the new software. As he states "She made frequent errors in her deposits and in inputting information into the new software, and I had to

repeatedly explain to her how to input the data. She also could not reconcile deposits. The personnel at the Valparaiso, Warsaw and Plymouth offices learned the software quickly and never had the problems Merry had". (Id. ¶ 4)

The Plaintiff denies that Defendant changed its software:

> Q. So there was new software that was introduced to the business.
>
> A. Well, actually I don't think it was new software, it is just a new machine, it was a scanner. It wasn't new software. (Plaintiff's dep. Ex. 10, p. 93, l. 20-23)
>
> …
>
> Q. And you're saying again, there was no new software introduced by Pioneer?
>
> A. No, just new machinery. (Id. p. 96, l. 2-4)

In Brent Schafer's affidavit, paragraph 11, Exhibit "B" page 3 is receipt number 14684 signed by M. Warner indicating "New Software" and states "Setting up new software program". For the Plaintiff to state it was only a scanner further demonstrates how incompetent she was.

She herself seems to acknowledge some incompetency in the instant messages at Exhibit "8" to Brent Schafer's affidavit and her deposition testimony. For instance:

> (a) 7-10-08 – 11:19 – How R U coming on all the computer input on all these accounts --- I think I'm going INSANE! (Schafer aff. Ex. 7 p. 7-3)

In her deposition she was asked why she was going insane and responded:

> A. They gave you a briefing -- I don't know, because the things change. And every 30 days they wanted a -- their
> top selling times were spring, summer. So you were the
> most busy in spring, summer for sales, and changes in

the scanner that I've never worked with before.

Q. That's why you felt you were going insane?

A. Yeah. It's just a figure of speech just something
   different. (Dep. Ex. 10, p. 59, l. 17-25)

Again on July 12th:

7-12-08 – 1:45 – I hate this system -- Merry our printer
needs to be feed by hand the lazer printer -- its been that
way for 3 months -- do you know anyone looking for a job
in osceola – Merry. (Schafer aff. Ex. 7 p. 7-3)

When asked about this in the deposition what she meant by looking for a job her

testimony was:

A. It doesn't mean anything. I mean, probably that I'm fed
   up.

Q. With what's driving you insane?

A. Yeah. With that on top of everything.

Q. You state - -

A. But I've never told Lori about what the devil was going
   on.

Q. You told her before you're doing five things at one time
   going crazy.

A. Yeah, I was responsible for a lot. (Dep. Ex. 10, p. 60 to
   p. 61, l. 8)

At page dep. page 63 she acknowledges "I know I've made mistakes" (Ex. 10, p.

63, l. 7). She also acknowledges the stress from lost checks was killing her:

A. Uh I remember finding checks, yeah, you know, I – I
   certainly didn't drop these. Yeah yeah.

…

Q. You then say in it, you say; the stress is killing me.

What's the stress you are talking about?

    A.  Uh, probably the shortage.  Because I - - you know, I
        don't want people to think I'm a thief. (Ex. 10, p. 100,
l.
        4-15)

Because of her inability to do her job, Brent Schafer, vice-president of Pioneer

Auto Sales & Leasing and in charge of operations, terminated her. (Schafer aff. ¶ 2 and

8)

Plaintiff attempts to refute her poor work performance by citing bonuses she

received.  However, as Mr. Schafer indicates: "The bonuses are based upon the sales of

the store, not the performance of the office person.  Since the sales deserved the bonus,

our policy was to also bonus the office help" (Id. ¶ 6).  Therefore, the bonuses had

nothing to do with her individual work performance.

LEGAL DISCUSSION – SEXUAL HARASSMENT/DISCRIMINATION

For a party to survive summary judgment, they must make a sufficient showing of

evidence on each element on which it bears the burden of proof.  Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986).

In order to establish the sexual harassment claim, the Plaintiff must show:

    1.  She was subjected to unwelcome harassment;
    2.  The harassment was based on her sex;
    3.  The harassment was sufficiently severe or pervasive so
        as to alter the condition of her employment and create a
        hostile or abusive atmosphere; and
    4.  There is a basis for employer liability.
    Hall v. Bodine Elect. Co., 276 F 3d 345, 354-55 (7th Cir.
    2002)

Further, to prove that the environment was hostile, she must show that it was both

objectively and subjectively offensive.  Rhodes v. ILL. Dept.'s of Transportation, 359 F

3d 498, 505 (7th Cir. 2004)  Whether or not conduct is objectively offensive includes the frequency of the conduct; its severity; whether it was physically threatening or humiliating or a mere offensive utterance, and whether or not it unreasonably interfered with the work performance.  Hostetler v. Quality Dining, Inc., 218 F 3d 798, 806-07 (7th Cir. 2000).  "Occasional vulgar banter, tinged with sexual innuendo of course or boorish workers does not create a work environment that a reasonable person would find intolerable.  Baskervile v. Culligan International Co., 50 F 3d 428, 430 (7th Cir. 1995).  Further, sexual harassment has to be subjectively offensive.

The facts in this case demonstrate that Plaintiff never complained to anyone about any kind of sexual harassment or discrimination until she was terminated, and then to the EEOC, and therefore the situation was not subjectively offensive nor was it objectively offensive.  What little sexual innuendo there is in the message transmissions in Exhibit 8 from Chris Sarna, was invited by the Plaintiff herself who was clearly the aggressor.

To establish sex discrimination the Plaintiff must show:

1. She was a member of a protected class;
2. She was performing her job satisfactorily;
3. She suffered an adverse employment action; and
4. Similarly situated employees outside of her protective class were treated more favorably.

If she does so, then the Defendant must assert a legitimate non-discriminatory reason.  In this case, the Defendant has done that with the evidence that she could not master the new software.  The burden then shifts back to the Plaintiff to establish that Defendant's explanation is pretextual.  Plaintiff's claim fails in several respects: first, although she is in a protected class, she did not perform her job satisfactorily and she

cannot establish that the Defendant's explanation is pretextual from the evidence previously cited.

AGE DISCRIMINATION

The Court lacks jurisdiction to determine this case because the requisite number of employees for an age discrimination case is 20, and Defendant only had 17.

Further, in order to establish a prima facia case for age discrimination, a plaintiff must show:

1. She was a member of a protected class;
2. She was meeting his employer's legitimate job expectations;
3. She suffered an adverse employment action; and
4. Similarly situated employees not in the protected class were treated more favorably.

Plaintiff cannot show she was meeting the employer's legitimate job expectations nor can she show that similarly situated employees not in the protected class were treated more favorably. In this case even if she had, the employer can show that she was not meeting the legitimate job expectations and therefore prevail. The Plaintiff cannot establish that that explanation is pretextual in order to defeat the defense. "The plaintiff must demonstrate that employer's reason is unworthy of belief." O'Neil v. City of New Albany, 293 F 3d 998, 1005(7th Cir. 2002).

Finally, Plaintiff cannot create any credibility issues because before credibility can be used to defeat summary judgment it must be on an issue where presence and demeanor would make a difference. The Advisory Committee Notes 2 Fed. R. Civ. P. 56E states that issues of credibility defeats summary judgment only "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in

order to evaluate their credibility."  In this case, the Plaintiff 's testimony destroys her own credibility without the need for observation.

CONCLUSION

Plaintiff discovered the e-mail pictures upon which she relies to prove sexual harassment, some time in August or September 2008, and did not delete them.  These were initially transmitted by her predecessor, Rhonda Saltzman, to friends and family, many of whom are from Michigan.  Obviously, the e-mails were not subjectively offensive.  After Rhonda's departure, Brent Schafer thought he had scrubbed the computer for the next employee but obviously missed those e-mail pictures (Schafer aff. ¶ 19).

On June 19th, 2009, the Plaintiff forwarded them to herself at her home address. Chris Sarna did not because he was not at the Osceola store, although she tries to put him there, because she realizes the implication of her sending them to herself.  However, she does acknowledge sending "Alabama Death Penalty" (Ex. 4 Saltzman), to her sister.  No doubt so that she could enjoy it also.

The messages that were authenticated establish that she invited sexual banter and the many passages that she denies are so closely connected to the ones that she does acknowledge, that the picture is clear.  Her ridiculous explanation that within a 55 second time period Sonny Balzer came in and sent the next one is absurd.  She put Sonny doing that for the same reason that she puts Chris at Osceola on June 19th.  This lawsuit is an egregious fabrication and therefore summary judgment should be granted to Defendant.

**Wyland, Humphrey, Wagner
& Clevenger, LLP.**

23

/s/ Jere L. Humphrey
Jere L. Humphrey, #7885-50
319 West Jefferson Street
P.O. Box 158
Plymouth, Indiana 46563
Telephone: 574/936-2169

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of December 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/CM/ECF system which sent notification of such filing to Richard J. LaSalvia, 105 E. Jefferson Blvd., Suite 220, South Bend, IN 46601, said attorney being the attorney of record in the above cause.

/s/ Jere L. Humphrey
Jere L. Humphrey